UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

---

JUA SMITH,

Plaintiff,

v.

9:17-cv-00558
(AMN/TWD)

ANTHONY J. ANNUCCI, et al.,

Defendants.

---

APPEARANCES: OF COUNSEL:

JUA SMITH
98-A-0346
*Plaintiff, pro se*
Great Meadow Correctional Facility
Box 51
Comstock, NY 12821

HON. LETITIA JAMES
New York State Attorney General
*Attorney for Defendants*
The Capitol
Albany, NY 12224

MATTHEW GALLAGHER, ESQ.
BRITTANY M. HANER, ESQ.

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

**ORDER AND REPORT-RECOMMENDATION**

## I. INTRODUCTION

This matter has been referred for a report and recommendation by the Honorable Anne M. Nardacci, United States District Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3(c).[1]

---

[1] This action was originally assigned to the Honorable Lawrence E. Kahn, Senior United States District Judge. By Decision and Order entered January 19, 2023, the case was reassigned to District Judge Nardacci. (Dkt. No. 207.)

Plaintiff Jua Smith, proceeding *pro se* in this 42 U.S.C. § 1983 ("Section 1983") civil rights action, alleges wrongdoing while he was incarcerated at Coxsackie Correctional Facility ("Coxsackie C.F."). (Dkt. No. 159.) Discovery is now closed, and the named Defendants have moved for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure. (Dkt. No. 197.[2]) Plaintiff has opposed the motion, and submitted record evidence in support of his opposition, including a declaration. (Dkt. No. 202.[3]) Defendants filed a reply and, with permission from the Court, Plaintiff filed a sur-reply. (Dkt. Nos. 205, 206.) For the reasons set forth below, the Court recommends Defendants' motion for summary judgment be granted.

## II. RELEVANT BACKGROUND AND PROCEDURAL HISTORY[4]

In May of 2017, Plaintiff commenced this action by filing a complaint asserting claims pursuant to Section 1983, together with an application to proceed *in forma pauperis* ("IFP"). (Dkt. Nos. 1, 3.) On October 20, 2017, the Court granted Plaintiff's application to proceed IFP. (Dkt. No. 9.) The following claims survived 28 U.S.C. § 1915(e)(2)(B) and 28 U.S.C. § 1915A(b) review: (1) a request for injunctive relief against Martuscello and Annucci in their official capacities with respect to restoration of Plaintiff's privileges; (2) Eighth Amendment medical indifference claims against Martuscello, Smith, Miller, Baldwin, and Rizzi; (3) Eighth

[2] Defendants' submission includes a Notice of Motion (Dkt. No. 197); Attorney Affirmation with exhibits (Dkt. No. 197-1); Declaration of Annucci with exhibits (Dkt. No. 197-2); Declaration of Baldwin with exhibits (Dkt. No. 197-3; Dkt. No. 198); Declaration of Barringer with exhibits (Dkt. No. 197-4); Statement of Material Facts (Dkt. No. 197-5); Memorandum of Law (Dkt. No. 197-6); and Declaration of Service (Dkt. No. 197-7).

[3] Plaintiff's submission includes a Response to Defendants' Statement of Material Facts (Dkt. No. 202); Memorandum of Law (Dkt. No. 202-1); Declaration of Plaintiff (Dkt. No. 202-2); and exhibits (Dkt. Nos. 202-3 through Dkt. No. 202-5).

[4] This matter has an extensive procedural history familiarity with which is assumed. (*See generally* Docket Report.) The Court summarizes the relevant procedural history to the instant motion herein.

Amendment conditions of confinement claims against Martuscello and Smith; (4) Fourteenth Amendment due process claims against Martuscello and Smith regarding Plaintiff's infirmary confinement; (5) First Amendment retaliation claims against Barringer, Kenneweg, Raymond, Arvidson, Wagner, Jackson, Barnes, Martuscello, Smith, Miller, Baldwin, Rizzi, Annucci, and Almasi; (6) First Amendment free exercise claims against Annucci, Martuscello, Smith, Miller, Baldwin, and Rizzi; (7) First Amendment retaliation claim against Almasi for denying him access to general library materials; (8) state assault and battery claims against Martuscello, Smith, and Miller; and (9) a Religious Land Use and Institutionalized Persons Act ("RLUIPA") claim against the State of New York. *Id*. at 39-40.[5]  Upon Plaintiff's motion for reconsideration, the Court construed the complaint to also make out a claim for negligence as an alternative cause of action to Plaintiff's First Amendment retaliation and Eighth Amendment claims.  (Dkt. No. 31.)

On January 18, 2018, Plaintiff filed his first amended complaint ("FAC").  (Dkt. No. 34.) The Court reviewed the FAC and found all of the claims asserted in the original complaint that survived initial review and the negligence claim survived along with the (1) Eighth Amendment conditions of confinement claim against Slaven; (2) Fourteenth Amendment due process claim against Barringer regarding Plaintiff's infirmary confinement; and (3) First Amendment retaliation claim against Slaven.  (Dkt. No. 39.)  On June 5, 2018, the named Defendants, except Barnes, filed their answer to the FAC.  (Dkt. No. 52.)  Barnes filed an answer to the FAC on August 24, 2018.  (Dkt. No. 72.)

---

[5]  Page citations herein are those assigned by the Court's electronic filing system, CM/ECF. Paragraph numbers are used where documents identified by the CM/ECF docket number contain consecutively numbered paragraphs.  Unless otherwise indicated, excerpts from the record are reproduced exactly as they appear in the original and errors in spelling, punctuation, and grammar have not been corrected.

Plaintiff filed a motion to amend the FAC on September 27, 2018. (Dkt. No. 77.) The motion was granted on January 11, 2019, to the extent that it sought to "(1) add allegations related to equitable tolling and assert an Eighth Amendment conditions of confinement claim against Huff; (2) broaden his First Amendment free exercise claims and assert them against Barringer, Kenneweg, Martuscello and Smith based on their alleged denial of access to legal materials to Plaintiff ; (3) amend his First Amendment retaliation claims against Martuscello, Barringer, Kenneweg, Smith, Wagner, Jackson, Barnes, Almasi, Arvidson, Annucci, Baldwin, Miller, Rizzi, and Slaven; (4) withdraw [certain claims][6];[] and (5) maintain the other claims in the FAC that Plaintiff has reasserted, and which were found to survive *sua sponte* review,[] with the exception of Plaintiff's RLUIPA claim . . . , which is dismissed." (Dkt. No. 91 at 17-18.) The second amended complaint ("SAC") became the operative pleading on January 11, 2019. (Dkt. No. 92.) Defendants, excluding Huff, filed their answer to the SAC on January 28, 2019. (Dkt. No. 93.) Huff filed an answer to the SAC on June 3, 2019. (Dkt. No. 115.)

Plaintiff filed a motion to amend the SAC on December 19, 2019, which was granted on March 12, 2020. (Dkt. Nos. 137, 158.) The third amended complaint ("TAC") only replaced "Barnes" with "Davies". (Dkt. Nos. 158, 159.) Consequently, Plaintiff's claims against Barnes were dismissed, and Barnes was terminated as a party to the action. *Id*. All other Defendants

---

[6] The claims that Plaintiff sought to, and did, withdraw consisted of the following: (1) Plaintiff's request for injunctive relief against Martuscello and Annucci in their official capacities with respect to restricted privileges; (2) his Eighth Amendment conditions of confinement claim against Slaven; (3) his First Amendment free exercise claim against Miller, Baldwin, and Rizzi; (4) his general library claim against Almasi (now asserted as a retaliation claim); (5) his state law assault and battery claims against Martuscello, Smith, and Miller; (6) his state law negligence claims against Martuscello, Smith, Miller, Baldwin, and Rizzi; and (7) his constitutional claim of denial of meaningful access to the courts. (Dkt. No. 91 at 18 n.6.) Additionally, Plaintiff no longer asserted claims against Peters, Raymond, or Bradham and they were terminated as parties to the action. *Id*.

and claims remained. *See id*. The TAC was filed and became the operative pleading on April 6, 2020, and remains the operative pleading at this time. (Dkt. Nos. 158, 159.)

Detailed summaries of Plaintiff's allegations were included in the Court's October 20, 2017, and March 13, 2018, Orders. (Dkt. Nos. 9, 39.) A brief recitation of Plaintiff's SAC was provided in the January 11, 2021, Order, which is excerpted at length below. (Dkt. No. 91.[7]) To the extent additional facts were developed through discovery, and included in the summary judgment motion, the Court will discuss them in the analysis of the pending claims. References to undisputed facts are to Defendants' Statement of Material Facts and are incorporated herein. (Dkt. No. 197-5.[8])

Plaintiff was sentenced in 1997 to a prison term of twenty-five years to life for second degree murder, and became eligible for parole on April 24, 2021. (Dkt. No. 91 at 1-2.) As he neared his parole eligibility date, Plaintiff was reclassified from a maximum security A inmate to a maximum security B inmate, which entailed conditions that Plaintiff found unacceptable for his mental health and well-being. *Id*. at 1-2. Plaintiff claimed "actual innocence" and stated that he wanted to die by starvation rather than accept parole, and further, that he would rather die by starvation than be classified as a maximum B prisoner. *Id*. He alleged that he has a right to die via starvation in accordance with his sincerely held beliefs. *Id*.

---

[7] As noted, the TAC is identical to the SAC except Davies replaced Barnes, who is no longer named as a defendant. (*Compare* Dkt. No. 92 *with* Dkt. No. 159; *see also* Dkt. Nos. 158, 160.) All other Defendants and claims remained as set forth in Judge Kahn's January 11, 2019, Order, which accepted the SAC for filing. (Dkt. No. 91.) As such, the Court refers to that Order when referencing the Court's review of the TAC.

[8] In Response to Defendants' Statement of Material Facts, (Dkt. No. 202), Plaintiff admits paragraphs 1-24, 26-32, 35-45, 47, 50, 52-58, 60-64, 66-69, 72-74, 77, 81, 82, 88, 94, 96-105, 107-10, 113, 115, 119-22, 126-133, 135, 137, 140, 145-48, 150-53, 156-66, 169-71, 175-77, 179-87, 192, 193.

In May of 2013, Plaintiff started a hunger strike. *Id*. The Coxsackie C.F. obtained a force feed order in June of 2013, which Plaintiff unsuccessfully appealed in the state courts. *Id*. at 5-7. After Plaintiff started his hunger strike, he was transferred to the Coxsackie C.F. infirmary (hereafter "infirmary"), where he alleges the room was cold and he was deprived of sufficient clothing, blankets, and personal property. *Id*. at 8. Medical personnel also used feeding tubes that were too large in order to cause Plaintiff pain. *Id*. Plaintiff further alleged retaliatory restrictions on certain privileges, including access to his property, his mail, the general and law libraries, and recreation without any type of hearing or deprivation order. *Id*. at 9-11. Plaintiff claimed these restrictions and harassment were in retaliation for his hunger strike and for filing grievances and complaints. *Id*.

Construed liberally, Plaintiff asserts: (1) Eighth Amendment deliberate indifference claims against Baldwin, Martuscello, Miller, Rizzi, and Smith arising out of the use of certain nasogastric tubes during force feedings; (2) Eighth Amendment conditions of confinement claims against Huff, Martuscello, and Smith for the conditions he was subject to while in the infirmary; (3) First Amendment retaliation claims against Almasi, Annucci, Arvidson, Baldwin, Barringer, Davies, Kenneweg, Jackson, Martuscello, Miller, Rizzi, Slaven, Smith, and Wagner as a result of alleged conduct by these defendants in the infirmary during his hunger strike; (4) Fourteenth Amendment due process claims against Barringer, Martuscello, and Smith for his confinement to the infirmary; and (5) First Amendment free exercise claims against Annucci, Barringer, Kenneweg, Martuscello, and Smith for obtaining the force feed order and administering force feedings in violation of his sincerely held religious beliefs. *Id*.; *see also* Dkt. Nos. 158, 159, 160.

Generally, in their memorandum of law, Defendants argue Plaintiff's claims should be dismissed because: (1) the conditions Plaintiff experienced during his confinement in the prison infirmary were not sufficiently serious and there is no evidence Huff, Martuscello, and Smith acted with a culpable state of mind; (2) Baldwin, Martuscello, Miller, Rizzi, and Smith were not deliberately indifferent to Plaintiff's medical needs and the claim is barred by the statute of limitations; (3) Plaintiff's confinement to the infirmary did not implicate a liberty interest, and, even if it did, Barringer, Martuscello, and Smith are entitled to qualified immunity; (4) Plaintiff's retaliation claims against Almasi, Annucci, Arvidson, Baldwin, Barringer, Davies, Kenneweg, Jackson, Martuscello, Miller, Rizzi, Slaven, Smith, and Wagner premised upon his hunger strike fail as a matter of law because a hunger strike is not a constitutionally protected activity, the alleged retaliatory actions do not constitute adverse actions, and they are entitled to qualified immunity; (5) Plaintiff has failed to establish a free exercise claim against Annucci, Barringer, Kenneweg, Martuscello, and Smith and they are entitled to qualified immunity; and (6) Annucci is entitled to dismissal for lack of personal involvement.  (Dkt. No. 197-6.)

## III.    LEGAL STANDARD GOVERNING MOTIONS FOR SUMMARY JUDGMENT

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986).  The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Salahuddin v. Gourd*, 467 F.3d 263, 272-73 (2d Cir. 2006).  A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248; *see Jeffreys v. City of New*

*York*, 426 F.3d 549, 553 (2d Cir. 2005).  The movant may meet this burden by showing that the

nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an

element essential to that party's case, and on which that party will bear the burden of proof at

trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

 If the moving party satisfies its burden, the nonmoving party must move forward with

specific facts showing there is a genuine issue for trial.  *Salahuddin*, 467 F.3d at 273.  In that

context, the nonmoving party must do more than "simply show that there is some metaphysical

doubt as to the material facts."  *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.*,

475 U.S. 574, 586 (1986); *see also Jeffreys v. City of New York*, 426 F.3d 549, 554 (2d Cir.

2005) ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be

insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff.  At

the summary judgment stage, a nonmoving party must offer some hard evidence showing that its

version of the events is not wholly fanciful.").  "Conclusory allegations, conjecture and

speculation . . . are insufficient to create a genuine issue of fact."  *Kerzer v. Kingly Mfg.*, 156

F.3d 396, 400 (2d Cir. 1998).  Statements "that are devoid of any specifics, but replete with

conclusions, are insufficient to defeat a properly supported motion for summary judgment."

*Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

 In determining whether a genuine issue of material fact exists, the court must resolve all

ambiguities and draw all reasonable inferences against the moving party.  *Major League

Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008).  Where a party is

proceeding *pro se*, the court is obligated to "read [the *pro se* party's] supporting papers liberally,

and . . . interpret them to raise the strongest arguments that they suggest."  *Burgos v. Hopkins*, 14

F.3d 787, 790 (2d Cir. 1994).  "A verified complaint is to be treated as an affidavit . . . and

therefore will be considered in determining whether material issues of fact exist[.]"   Colon v. Coughlin, 58 F.3d 865, 872 (2d Cir. 1995) (citations omitted).  However, "a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment."  *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991).

## IV.    DISCUSSION

Defendants move for judgment as a matter of law and dismissal of all of Plaintiff's remaining claims.  (Dkt. No. 197.)  Plaintiff opposes Defendants' motion and abandons and/or withdraws some of the claims that were liberally construed by the Court to survive *sua sponte* review.  (Dkt. No. 202.)  Defendants filed a reply, and Plaintiff filed a sur-reply.  (Dkt. Nos. 205, 206).

### A.    New York State

At the outset, the Court notes New York State is still active on the docket and listed as a defendant despite dismissal of Plaintiff's RLUPIA claim against New York State and no other surviving claims asserted against it.  (Dkt. No. 197-5 at ¶¶ 3-24; *see also* Dkt. No. 91 at 9, 13-16.)  Therefore, the Court recommends that the Clerk be directed to terminate New York State as a party to this action.

### B.    Abandonment of Due Process, Free Exercise, and Certain Retaliation Claims

As set forth above, the Court read the TAC liberally to find Plaintiff asserted First Amendment free exercise claims against Annucci, Barringer, Kenneweg, Martuscello, and Smith for obtaining the force feed order and administering force feedings in violation of his religious beliefs and Fourteenth Amendment due process claims against Barringer, Martuscello, and Smith for his confinement in the infirmary during his hunger strike.  (Dkt. No. 91 at 18 n.7; *see also* Dkt. No. 197-5 at ¶¶ 91-92, 188-95.)  The Court also liberally construed First Amendment

retaliations claim against all Defendants except Huff.  (Dkt. No. 91 at 18 n.7; *see also* Dkt. No. 197-5 at ¶ 93.)

     As noted, Defendants seek dismissal of all claims on various grounds.  (See Dkt. No. 197-6 at 8-9.)  In his opposition submission, Plaintiff states he does not assert a free exercise or due process claim, and only seeks to proceed on certain claims of retaliation.  (Dkt. No. 202 at ¶¶ 91-92, 188-95; *see also* Dkt. No. 202-2 at ¶¶ 1, 5-6; Dkt. No. 202-1 at 7-10.)  To that end, Plaintiff does not oppose Defendants' motion to the extent it seeks dismissal of his (1) First Amendment free exercise claims against Annucci, Barringer, Kenneweg, Martuscello, and Smith; (2) Fourteenth Amendment due process claims against Barringer, Martuscello, and Smith; and (3) First Amendment retaliation claims against Annucci, Baldwin, Kenneweg, Miller, Rizzi, and Smith.  (*See* Dkt. No. 202-1.)  Plaintiff confirms that he only wishes to proceed on certain "active claims" as set forth in his response, and opposes Defendants' motion for summary judgment "ONLY" as to his (1) First Amendment retaliation claims against Almasi, Arvidson, Slaven, Wagner, Jackson, Davies, Martuscello, and Barringer; (2) Eighth Amendment conditions of confinement claims against Martuscello, Smith, and Huff, arising from the "malicious and sadistic" prolonged confinement without warm clothing, underwear, and sufficient blankets in the infirmary; and (3) Eighth Amendment medical indifference claims against Martuscello, Smith, Miller, Baldwin, and Rizz stemming from the "malicious and sadistic treatment for repeated force feedings with a too large nasal gastric ("NG") tube, without anesthetic."  (Dkt. No. 202-2 at 1.)

     In their reply, Defendants argue "Plaintiff's opposition papers also bring to light that, regardless of the disposition of Defendants' motion, Plaintiff's due process and free exercise claims should be dismissed and Defendants Annuci and Kenneweg should be terminated from

the action." (Dkt. No. 205 at 3.) In his sur-reply, Plaintiff does not object to Defendants' characterization of his opposition submission, but does take issue with other alleged "false" statements asserted by Defendants in their reply. (Dkt. No. 206.) Insofar as Defendants argue that dismissal is warranted based on Plaintiff's abandonment of the foregoing claims, the Court agrees.

Therefore, in light of Plaintiff's most recent sworn submissions to the Court, Plaintiff's due process and free exercises claims should be dismissed as abandoned, along with his retaliation claims against Annucci, Baldwin, Kenneweg, Miller, Rizzi, and Smith. (Dkt. No. 205 at 1.) *See, e.g.*, *Porter v. Uhler*, No. 9:17-CV-47 (MAD/TWD), 2019 WL 1292226, at *6 (N.D.N.Y. Mar. 21, 2019) (granting summary judgment and dismissing a due process claim, as abandoned, where the due process claim was liberally construed on initial review but thereafter the *pro se* inmate made affirmative representations explaining that it was "never" his "intention" to bring a due process claim); *see also Wiggan v. New York City Dep't. of Correction*, No. 12-CV-1405, 2014 WL 4631456, at *3 (W.D.N.Y. Sept. 16, 2014) (granting summary judgment and dismissing certain claims, as abandoned, that a *pro se* inmate failed to address in response to the defendants' motion for summary judgment).

Accordingly, the Court recommends the motion for summary judgment be granted with respect to Plaintiff's (1) First Amendment free exercise claims against Annucci, Barringer, Kenneweg, Martuscello, and Smith; (2) Fourteenth Amendment due process claims against Barringer, Martuscello, and Smith; and (3) First Amendment retaliation claims against Annucci, Baldwin, Kenneweg, Miller, Rizzi, and Smith, and that these claims be dismissed, as abandoned, with prejudice.

### C.    Conditions of Confinement

#### 1.    Legal Standard

The Eighth Amendment protects prisoners from "cruel and unusual punishment" in the form of "unnecessary and wanton infliction of pain" at the hands of prison officials. *Wilson v. Seiter*, 501 U.S. 294, 297 (1991); *Estelle v. Gamble*, 429 U.S. 97, 104 (1976); *Sims v. Artuz*, 230 F.3d 14, 20 (2d Cir. 2000). The constitutional prohibition against cruel and unusual punishment includes the right to be free from conditions of confinement that impose an excessive risk to an inmate's health or safety. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994). To establish an Eighth Amendment claim based on unsafe or medically inappropriate living conditions, a plaintiff must establish that (1) he was incarcerated under conditions which posed a substantial risk of serious harm, and (2) prison officials acted with deliberate indifference to his health or safety. *See Farmer*, 511 U.S. at 834.

"The deliberate indifference standard embodies both an objective and a subjective prong." *Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994). Under the objective standard, a plaintiff must allege a deprivation "sufficiently serious" to constitute a constitutional violation. *Hathaway*, 37 F.3d at 66 (quoting *Wilson*, 501 U.S. at 298)). "Because society does not expect or intend prison conditions to be comfortable, only extreme deprivations are sufficient to sustain a 'conditions-of-confinement' claim." *Blyden v. Mancusi*, 186 F.3d 252, 263 (2d Cir. 1999) (citing *Hudson v. McMillan*, 503 U.S. 1, 9 (1992) (only those deprivations denying "the minimal civilized measures of life's necessities" are sufficiently serious to form the basis of an Eighth Amendment violation) (internal quotations and citations omitted)). An inmate must show "that the conditions, either alone or in combination, pose an unreasonable risk of serious damage to his health." *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013). Health includes the risk of serious

damage to "physical and mental soundness." *Darnell v. Pineiro*, 849 F.3d 17, 30 (2d Cir. 2017) (quoting *LaReau v. MacDougall*, 473 F.2d 974, 978 (2d Cir. 1972)). There is no "static test" for determining whether a deprivation is serious enough to violate an inmate's Eighth Amendment rights. *Walker v. Schult*, 717 F.3d 119, 125 (2d Cir. 2013) (citing *Jabbar v. Fischer*, 683 F.3d 54, 57 (2d Cir. 2012)). "The conditions themselves must be evaluated in light of contemporary standards of decency." *Jabbar*, 683 F.3d at 57 (citation and internal quotation marks omitted). "Ultimately, to establish the objective element of an Eighth Amendment claim, a prisoner must prove that the conditions of his confinement violate contemporary standards of decency." *Phelps v. Kapnolas*, 308 F.3d 180, 185 (2d Cir. 2002) (citations omitted).

The subjective element of the Eighth Amendment analysis focuses on whether the defendant official acted with "a sufficiently culpable state of mind." *Salahuddin*, 467 F.3d at 280 (citing *Wilson*, 501 U.S. at 300). "Deliberate indifference" requires more than negligence, but less than conduct undertaken for the very purpose of causing harm. *Farmer*, 511 U.S. at 835. In order for a prison official to act with deliberate indifference, he must know of and disregard an excessive risk to an inmate's health or safety. *Hathaway*, 37 F.3d at 66. The official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference. *Id*.

**2. Analysis**

Plaintiff asserts Eighth Amendment conditions of confinement claims against Huff, Martuscello, and Smith for their "malicious and sadistic treatment resulting from the prolonged confinement [in the infirmary] without warm clothing, underwear, and sufficient blankets, in order to use cold temperature as a weapon." (Dkt. No. 159 at 169.) Defendants argue Plaintiff's

allegations are insufficient to establish either the objective or subjective prong of the unconstitutional conditions of confinement test.  (Dkt. No. 197-6 at 12-15; Dkt. No. 205 at 2-7.)

The record demonstrates Plaintiff began his hunger strike on May 10, 2013, to protest his security classification, and, after not eating for seven days and losing weight, was admitted to the infirmary for monitoring on May 17, 2013.  (Dkt. No. 197-5 at ¶¶ 54, 55.)  On May 29, 2013, Plaintiff went into kidney failure and was taken to Albany Medical Center for treatment.  *Id*. at ¶ 62.  On June 6, 2013, DOCCS obtained a force feed order from the New York State Court of Greene County.  *Id*. at ¶ 63.  Plaintiff was thereafter subjected to force feedings via nasogastric intubation beginning on June 10, 2013.  *Id*. at ¶ 64.  On July 19, 2013, Plaintiff was released back into the general population; however, he was returned to the infirmary on July 23, 2013, where he remained until January 21, 2014, when he was again released into the general population for approximately three weeks.  *Id*. at ¶¶ 56, 57.  Plaintiff was returned to the infirmary for the third time on February 14, 2014, where he remained until he was transferred to Elmira Correctional Facility on July 2, 2018.  *Id*. at ¶ 58.

In the TAC, Plaintiff alleges that upon first being transferred to the infirmary on May 17, 2013, he was placed in a very cold, air-conditioned room with bed sheets and "one very thin blanket": he was not allowed his personal property from his general population cell; and he was only allowed "thin infirmary pajamas, the boots and underwear [he] had on, toilet paper, soap, [a] toothbrush and toothpaste."  (Dkt. No. 159 at ¶¶ 78-81.)  "Later that night a C.O. brought [Plaintiff] another thin blanket."  *Id*. at ¶ 85.  However, he was "still freezing."  *Id*. at ¶ 86.  He also was denied deodorant and lotion, "which meant [he] couldn't moisturize [his] lips which would crack and bleed."  *Id*. at ¶ 89.

In his sworn declaration submitted in response to the instant motion, Plaintiff states that on May 21, 2013, he was provided with "1 set of greens, 3 tee shirts, undershorts, and socks." (Dkt. No. 202-2 at ¶¶ 136, 137.)  Plaintiff did not, however, consider the items "warm clothes" and they did "little to keep [him] warm."  *Id*. at ¶ 137.  About a month later, Plaintiff was provided lotion.  *Id*. at ¶ 118.  However, it was "not until the end of July" that Smith, the Deputy Superintendent of Health, ordered "infirmary officers to allow [Plaintiff] more than 2 thin infirmary blankets to stay warm."  *Id*. at ¶ 98.  He also was finally allowed his thermal underwear, sweatshirt, and winter hat.  *Id*.

According to Plaintiff, Superintendent Martuscello and Deputy Superintendent of Health Smith were "deliberately using cold temperature, and degrading treatments as a weapon to force [him] to quit [his] hunger strike." (Dkt. No. 202 at ¶ 89.)  He also claims that between May 17 and May 21, 2013, Huff, a Sergeant, ignored his complaints about being placed in a very cold room with only two thin blankets; not having clothing except pajamas, boots, and the one pair of underwear he was wearing; not being allowed toiletries apart from toilet paper, soap, a toothbrush, and toothpaste; and being denied personal property from his general population cell. (Dkt. No. 197-5 at ¶ 90.[9])

Here, nothing in the record supports a finding that these conditions were objectively serious in a constitutional sense.  "The temporary or limited exposure to conditions that fall below the 'contemporary standards of decency' do not amount to Eighth Amendment violations."  *White v. Smith*, No. 9:17-CV-1094 (LEK/ATB), 2021 WL 5989600, at *8 (N.D.N.Y. Oct. 15, 2021) (citing *Ford v. Phillips*, No. 05 Civ. 6646, 2007 WL 946703 (S.D.N.Y. Mar. 28, 2007) (finding that, as a matter of law, minor and temporary deprivations of property,

---

[9]  Plaintiff states the "TV denial is not part of this claim."  (Dkt. No. 202 at ¶ 90.)

showers, and recreation "in no way involved the severity of treatment which must be shown to make out a case of cruel and unusual punishment")), *report-recommendation adopted*, 2021 WL 5988626 (N.D.N.Y. Dec. 17, 2021). Indeed, conditions of confinement are not cruel and unusual for Eighth Amendment purposes simply because they are "restrictive and even harsh." *Anderson*, 757 F.2d at 35.

To be sure, a prisoner's exposure to frigid temperatures for a prolonged period of time may state an Eighth Amendment claim. *See Gaston v. Coughlin*, 249 F.3d 156, 164 (2d Cir. 2001) (involving claim by a plaintiff that he was subjected to temperatures at or below freezing for a five month period because of numerous broken windows in his cell block that were not repaired for an entire winter). However, Plaintiff's claim that he was subjected to a very cold, air-conditioned room in the infirmary with the benefit of only two blankets, sheets, and pajamas for four days does not rise to a level of constitutional significance. *See, e.g.*, *Borges v. McGinnis*, No. 03-CV-6375, 2007 WL 1232227, at *4-5 (W.D.N.Y. Apr. 26, 2007) (rejecting Eighth Amendment claim where plaintiff was allegedly kept in a cold cell for three days without a blanket); *Walker v. Schriro*, No. 11-CV-9299, 2013 WL 1234930, at *12-13 (S.D.N.Y. Mar. 26, 2013) (allegations that the plaintiff was forced to sleep at an intake area with constant air conditioning system blowing extreme cold air onto the plaintiff, who lacked blankets and sheets, for a period of more than two days was insufficient to support an Eighth Amendment violation); *White*, 2021 WL 5989600, at *8 (N.D.N.Y. Oct. 15, 2021) (dismissing the inmate's claims that he was "freezing" at Upstate Correctional Facility in May for three days before he was provided a blanket). Nor does the denial of a change of underwear for four days, or lotion for approximately one month, amount to a constitutional violation. *See McCorkle v. Walker*, 871 F. Supp. 555, 557 (N.D.N.Y. 1995) (finding that lack of a change of underwear for 15 days does

not comprise an Eighth Amendment violation); *see also Cusamano v. Carlsen*, No. 9:08-CV-755 (FJS/GHL), 2011 WL 7629512, at *9 (N.D.N.Y. Dec. 16, 2011) ("being deprived of shower slippers, shampoo, lotion, and acceptable soap for a period of approximately twenty-six days is not 'objectively sufficiently serious' and does not amount to the denial of 'the minimal civilized measure of life's necessities'"), *report-recommendation adopted*, 2012 WL 1036854 (N.D.N.Y. Mar. 27, 2012).

Although Plaintiff testified that he was "constantly cold", he does not describe how the "coldness" rose to the level of cruel and unusual punishment. Plaintiff does, however, admit, "my not eating and weight loss made me especially susceptible to cold." (Dkt No. 202-2 at ¶ 144.) Plaintiff states that "[t]he medical staff explained to me that my body needed food to generate heat. And my weight loss was my body using fat reserves that would otherwise keep me warm." *Id*. Plaintiff continues, "I have no doubt this is true. And, therefore, they understood my complaints of cold were legitimate. Yet, deliberately chose to keep me without warm clothes." *Id*. at ¶ 145. However, it must be noted that Plaintiff chose to go on the hunger strike and that weight loss and temporary discomfort are consequences of refusing to eat. *See Stevens v. Cuomo*, No. 9:21-CV-0306 (GLS/ML), 2021 WL 3165364, at *5 (N.D.N.Y. July 27, 2021) (citing *Owens v. Hinsley*, 635 F.3d 950, 955 (7th Cir. 2011) ("[I]f weight loss and temporary discomfort are the only consequences of refusing to eat, then the inmate's choice to go on a hunger strike raises no Eighth Amendment concern." (citations omitted)); *Green v. Phillips*, No. 04-CV-10202, 2006 WL 846272, at *5 (S.D.N.Y. Mar. 31, 2006) (dismissing Eighth Amendment claim because the plaintiff chose to go on the hunger strike and the symptoms did not rise to the level of a "sufficiently serious" condition, *i.e.*, "a condition of urgency, one that

may produce death, degeneration, or extreme pain" and were to be expected by someone who does not eat)).

Plaintiff "ends his claim" when he was able to provide himself "with livable conditions." (Dkt. No. 202-1 at 32.) "But that wasn't until months later–July. When he was given more blankets and his thermal underwear." *Id*. Insofar as Plaintiff claims he was "denied" his "codified minimum state property rights" during this time period and, therefore, was unable to "get warm" for months, it is well established that "a violation of a state law or regulation, in and of itself, does not give rise to liability under 42 U.S.C. § 1983." *Burroughs v. Mitchell*, 325 F. Supp. 3d 249, 285 (N.D.N.Y. 2018). Further, "[f]ailure to follow a DOCCS' Directive does not give rise to a § 1983 claim." *Id.*; *see also Sanders v. Gifford*, No. 9:11-CV-0326 (LEK/RFT), 2014 WL 5662775, at *4 (N.D.N.Y. Nov. 4, 2014) ("[E]ven assuming that [the defendant] . . . deviated from state procedures or DOCCS Directives, a violation of such rules and regulations does not, standing alone give rise to liability under § 1983."); *Ahlers v. Nowicki*, No. 9:12-CV-0539 (DNH/RFT), 2014 WL 1056935, at *4 (N.D.N.Y. Mar. 18, 2014) ("[C]laims involving the improper adherence to proprietary facility policies are incognizable under § 1983; only rights secured by the Constitution and federal law are actionable under § 1983.").

In sum, the Court cannot conclude that the conditions Plaintiff experienced in the infirmary rise to the level of cruel and unusual punishment. This determination hinges largely on the fact that Plaintiff admits he had underwear, pajamas, boots, sheets, and blankets while he was subject to the alleged "cold" in the infirmary; he was provided a second blanket his first night in the infirmary after complaining his was cold; he was only without certain personal items for approximately four days; he was provided lotion after approximately one month; and he was provided "extra blankets", thermal underwear, a sweatshirt, and a winter hat by July of 2013.

Given that none of these deprivations rose to an acute and conscience-shocking level, either alone or in combination, the relative brevity of Plaintiff's conditions in the infirmary precludes a finding that Plaintiff can satisfy the requirement of an objectively serious deprivation.

Additionally, Plaintiff has adduced no evidence to support his conclusory allegations that Huff, Martuscello, and Smith deprived him of "warmth" purposefully, much less with deliberate indifference to his health and welfare. *See, e.g.*, *Lewis v. Zon*, 920 F. Supp. 2d 379, 389 (W.D.N.Y. 2013) (noting that the plaintiff's "voluntary" engagement in a hunger strike "undercuts his claim of deliberate indifference") (citation omitted).

Accordingly, the Court recommends Defendants' motion for summary judgment be granted with respect to Plaintiff's Eighth Amendment conditions of confinement claims against Huff, Martuscello, and Smith.

**D. Medical Indifference**

**1. Legal Standard**

As set forth above, the Eighth Amendment prohibits the infliction of "cruel and unusual punishments" on those convicted of crimes, which includes punishments that "involve the unnecessary and wanton infliction of pain." *Wilson*, 501 U.S. at 297. "In order to establish an Eighth Amendment claim arising out of inadequate medical care, a prisoner must prove 'deliberate indifference to [his] serious medical needs.'" *Chance*, 143 F.3d at 702 (quoting *Estelle*, 429 U.S. at 104). "First, the alleged deprivation must be, in objective terms, sufficiently serious." *Chance*, 143 F.3d at 702. Regarding the objective element, a plaintiff must demonstrate a violation sufficiently objectively serious "in the sense that a condition of urgency, one that may produce death, degeneration, or extreme pain exists." *Hathaway v. Coughlin*, 99 F.3d 550, 553 (2d Cir. 1996). "Second, the defendant must act with a sufficiently culpable state

of mind." *Chance*, 143 F.3d at 702. That is, the plaintiff must demonstrate that the defendant "kn[ew] of and disregard[ed] an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837; *see also Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999) ("The subjective element is that the defendant must have had the necessary level of culpability, shown by actions characterized by 'wantonness.'") (citing *Wilson*, 501 U.S. at 298-99). Mere negligence is not actionable, *see Estelle*, 429 U.S. at 106, nor is a disagreement over the proper treatment. *Chance*, 143 F.3d at 703.

Further, "[i]t is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment claim." *Chance*, 143 F.3d at 703. Therefore, any "disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists or the timing of intervention, are not adequate grounds for a Section 1983 claim." *Sonds v. St. Barnabas Hosp. Correctional Health Servs.*, 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001). Prison officials have broad discretion in determining the nature and character of medical treatment afforded to inmates. *Id*. (citations omitted). An inmate does not have the right to treatment of his choice. *Dean v. Coughlin*, 804 F.2d 207, 215 (2d Cir. 1986).

**2. Analysis**

Plaintiff alleges Martuscello and Smith, along with medical personnel Dr. Miller, Nurse Administrator Baldwin, and Nurse Rizzi engaged in malicious, sadistic behavior in violation of the Eighth Amendment by "repeatedly force feeding the plaintiff with a too-large [NG] tube, without anesthetic[.]" (Dkt. No. 159 at 166-67; Dkt. No. 197-5 at ¶ 77.)

As set forth above, a force feed order was obtained by DOCCS on June 6, 2013.  (Dkt. No. 197-5 at ¶ 63.)  As a result of the force feed order, Plaintiff was subjected to feedings via NG intubation beginning on June 10, 2013, which involved a tube being placed into the nose, down the esophagus, and into the stomach.  *Id*. at ¶ 64.  By June 14, 2013, Plaintiff had been force fed seven or eight times using a "16 French" or "14 French" NG tube by Coxsackie medical staff in the infirmary.  (Dkt. No. 197-5 at ¶¶ 63, 66; Dkt. No. 202 at ¶ 63.)  According to Plaintiff, he regularly placed the NG tube himself, because he "found Miller's attempts so torturously painful, that doing it myself was the last best option."  (Dkt. No. 202-at ¶¶ 209, 210.)

The record demonstrates both "16 French" and "14 French" NG tubes are appropriate for, and indicated for, use on adults.  (Dkt. No. 197-5 at ¶ 81.)  They are also the most commonly used size NG tubes in adults.  *Id*. at ¶ 82.

On June 11, 2013, Plaintiff requested that smaller tubes be used during the force feedings.  *Id*. at ¶ 115.  On June 15, 2013, Plaintiff experienced swelling and had blood in his mucus as a result of the force feedings.  *Id*. at ¶ 117.  Between June 15 and June 18, 2013, Plaintiff was eating and drinking such that force feedings were not necessary.  *Id*. at ¶ 118.

"12 French" NG tubes were used for Plaintiff's force feedings beginning on June 18, 2013, and thereafter.  *Id*. at ¶ 119.  Plaintiff did not experience any bleeding or swelling from the use of the "12 French" NG tubes.  *Id*. at ¶ 120.  In 2015, Plaintiff underwent surgical placement of a gastronomy tube to facilitate the force feedings, which went directly to Plaintiff's stomach through the skin.  *Id*. at ¶ 69.

Here, Plaintiff claims Martuscello, Smith, Miller, Baldwin, and Rizzi "deliberately chose to use a much larger tube, with no lidocaine," even though smaller tubes were available from June 10 through June 15, 2013.  (Dkt. No. 202-1 at 12.)  According to Plaintiff, "[t]his was done

to cause Plaintiff so much pain during the force feedings that he would choose to eat regularly." *Id*. It also had the "added benefit" of force feeding Plaintiff as quickly as possible, so as to minimize the time the nurses needed to spend force feeding Plaintiff." *Id*.

**a. Statute of Limitations**

Defendants first argue Plaintiff's Eighth Amendment deliberate indifference claim is barred by the statute of limitations because the force feedings at issue occurred in June of 2013, and Plaintiff filed his original complaint in May of 2017.[10] (Dkt. No. 197-16 at 15-16; (Dkt. No. 205 at 3-4.) The statute of limitations for § 1983 actions is three years after the plaintiff's cause of action accrued. *See Owens v. Okure*, 488 U.S. 235, 240-41 (1989). "While state law supplies the statute of limitations for claims under § 1983, federal law determines when a federal claim accrues. The claim accrues when the plaintiff knows or has reason to know of the harm." *Eagleston v. Guido*, 41 F.3d 865, 871 (2d Cir. 1994) (internal quotation marks and citation omitted).

The Court finds Plaintiff knew or should have known of the harm at the time he was subjected to the allegedly "malicious and sadistic" force feedings with the "16 French" and "14 French" NG tubes by June 15, 2013, and the statute of limitations would have run three years later in June of 2016. Therefore, Plaintiff's claims relative to the force feeding with the "16

[10] Defendants state Plaintiff initiated this action on May 22, 2017, the date the original complaint was filed by the Clerk. (Dkt. No. 197-5 at ¶ 3.) However, under the "prison mailbox rule," the date of filing is deemed to be the date that the prisoner-plaintiff delivered his complaint to a prison guard for mailing to the court which, absent other evidence, is presumed to be the date that the complaint was signed. *Houston v. Lack*, 487 U.S. 266, 276 (1988); *Noble v. Kelly*, 246 F.3d 93, 97 (2d Cir. 2001). Thus, the Court assumes for purposes of this motion, Plaintiff initiated this action on May 16, 2017, the date the original complaint was signed. (Dkt. No. 1 at 160.)

French" and "14 French" NG tubes are time barred because the original complaint was not filed until May 16, 2017, nearly a year after the statute of limitations expired.

However, the Court must also determine whether the statute of limitations was tolled during any part of the three-year period. Equitable tolling is available in "rare and exceptional" cases where "extraordinary circumstances prevented a party from timely performing a required act," and "the party acted with reasonable diligence throughout the period" to be tolled. *Walker v. Jastremski*, 430 F.3d 560, 564 (2d Cir. 2005) (internal quotation marks omitted). The plaintiff bears the burden of establishing equitable tolling, *Boos v. Runyon*, 201 F.3d 178, 185 (2d Cir. 2000), and the Second Circuit has been clear that "[a]s a general matter, we set a high bar to deem circumstances sufficiently 'extraordinary' to warrant equitable tolling." *Dillon v. Conway*, 642 F.3d 358, 363 (2d Cir. 2011); *see also Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002) (stating the equitable tolling doctrine is "to be applied sparingly").

Here, Plaintiff argues the statute of limitations should be equitably tolled because he was "deprived" of his "codified rights to sufficient access to legal reference material, and legal assistance, to deny [him] the legal knowledge to seek redress and compensation in the courts, and to create an incentive for [him] to quit [his] hunger strike." (Dkt. No. 202-2 at ¶ 2.) He also seeks to toll the statute of limitations because he "thought that filing [his] claims in state court preserved them until they were totally exhausted, ala habeas corpus." *Id.* at ¶ 59. For reasons set herein, the Court disagrees.

First, it is well-settled that unfamiliarity with the law or legal procedure is not sufficiently extraordinary to toll the statute of limitations. *Fennel v. Artuz*, 14 F. Supp. 2d 374, 377 (S.D.N.Y. 1997) (excuse of "being uneducated and not familiar with legal research and legal procedures" did not warrant equitable tolling because it could be made by "virtually all

inmates"). Similarly, an inmate's restricted access to a prison law library does not create a basis for equitable tolling. *Id*. (rejecting an inmate's claim that inadequate access to the prison law library created a basis for equitable tolling of the three-year limitations period). Courts have found that "solitary confinement, lock-downs, and restricted access to the law library do not qualify as 'extraordinary circumstances' warranting equitable tolling." *Brown v. Bullis*, No. 9:11-CV-0647 (MAD/ATB), 2013 WL 1294488, at *4 (N.D.N.Y. Mar. 26, 2013); *see, e.g.*, *Stokes v. Miller*, 216 F. Supp. 2d 169, 172-73 (S.D.N.Y. 2000) (rejecting equitable tolling based on alleged difficulty in gaining access to prison law library and its staff); *see also Cross v. McGinnis*, No. 05 CIV. 504, 2006 WL 1788955, at *6 (S.D.N.Y. June 28, 2006) ("[I]t is not an extraordinary circumstance when a prisoner does not receive legal assistance from prison law library clerks").

Accordingly, the Court declines to equitably toll the statute of limitations on Plaintiff's deliberate indifference claims accruing before May 2014 based on alleged inadequate law library access; inability to "talk to legally trained clerks"; mistake of law; *pro se* status; and/or any other reason proffered by Plaintiff in his opposition submissions including but not limited to being denied he "codified right to sufficient access to the law library's mandated research material" or any DOCCS directive regarding law libraries and inmate legal assistance. (*See, e.g.*, Dkt. No. 202-2 at ¶¶ 15-95; Dkt. No. 202-1 at 23-30, Dkt. No. 206 at 1-2.)

Nevertheless, the Second Circuit has held that the statute of limitations for an inmate's Section 1983 claim must be tolled while the inmate is actively exhausting his administrative remedies. *Gonzalez v. Hasty*, 651 F.3d 318, 323-24 (2d Cir. 2011). The applicable statute of limitations is tolled during the time that an inmate is "'actively exhausting' his administrative remedies." *Melendez v. Greiner*, 477 F. App'x 801, 803 (2d Cir. 2012) (quoting *Gonzalez*, 651

F.3d at 322 n.2). The plaintiff bears the burden of showing that he is entitled to equitable tolling. *See Abbas v. Dixon*, 480 F.3d 636, 642 (2d Cir. 2007). The Court notes Plaintiff alleged in his original complaint and TAC—both sworn to under penalty of perjury—that he "exhausted his administrative remedies before filing this complaint." (Dkt. No. 1 at 15; Dkt. No. 159 at 15.) However, Plaintiff has failed to adduce evidence of the time period in which he was "actively exhausting" his administrative remedies that would change the result here.

Based on the current record, the Court finds Plaintiff has not demonstrated his entitlement to equitable tolling. Therefore, the Court recommends granting Defendants' motion on this ground and dismissing Plaintiff's Eighth Amendment deliberate indifference claims against Martuscello, Smith, Miller, Baldwin, and Rizzi as barred by the statute of limitations.[11]

Nevertheless, even if the Court were to conclude Plaintiff's Eighth Amendment deliberate indifference claims are not time barred, they fail on the merits, as discussed below.

**b. Merits**

Defendants also argue Plaintiff cannot establish that Martuscello, Smith, Miller, Baldwin, and Rizzi were deliberately indifferent to his medical needs. (Dkt. No. 197-6 at 15-19.) Specifically, Defendants contend Plaintiff was not deprived of medical care and the care provided met applicable standards. *Id.* Generally, in response, Plaintiff argues Martuscello, Smith, Miller, Baldwin, and Rizzi are not entitled to summary judgment because "the insertion of the tube was torturously painful. And [he] was offered no topical anesthetic." (Dkt. No. 202-2 at ¶¶ 2, 10, 12-95, 227.)

---

[11] However, out of special solicitude to Plaintiff as a *pro se* litigant, the Court also recommends allowing Plaintiff one final opportunity to demonstrate his entitlement to equitable tolling during the time period he was "actively" exhausting his administrative remedies on his Eighth Amendment deliberate indifference claims in any objection he may choose to file to the report-recommendation.

Here, assuming Plaintiff's medical needs were sufficiently serious for purposes of the Eighth Amendment, Plaintiff has failed to adduce any evidence establishing Martuscello, Smith, Miller, Baldwin, and Rizzi acted with the requisite state of mind with regard to those medical needs. The Court reaches this conclusion for the reasons stated by Defendants in their memorandum of law and reply. (Dkt. No. 197-6 at 15-19; Dkt. No. 205 at 7-8.)

As set forth above, the term "deliberate indifference" refers to a state of mind that is equivalent to criminal recklessness. Mere negligence by a DOCCS employee is not sufficient for a prisoner to state a claim under the Eighth Amendment. For this reason, a prisoner's disagreement with a DOCCS employee regarding the treatment that he should properly receive is insufficient to state a claim under the Eighth Amendment. While Plaintiff contends the medical staff at Coxsackie C.F. was deliberately indifferent because they used "16 French" and "14 French" NG tubes and no topical anesthetic to "numb" the pain for approximately five days in June of 2013, instead of the smaller, "12 French" NG tube, the record demonstrates both "16 French" and "14 French" NG tubes are medically indicated and appropriate for nasogastric feeding of an adult. (Dkt. No. 197-5 at ¶ 80.)

Further, in his declaration, Baldwin, a Nurse Administrator, avers there was no "malicious intent" to cause Plaintiff harm during the insertion of the tubes or during any of the force feedings at issue. (Dkt. No. 197-3 at ¶ 21.) He further declares "[a]t no time was Plaintiff subject to a serious risk of harm when using the '16 French' and '14 French' nasogastric tubes as compared with the use of the '12 French' size nasogastric tube, nor did I or anyone else I witnessed participating in the force feedings disregard an excessive risk to Plaintiff's health. In fact, Plaintiff's health and safety was a top priority during force feedings as he was in the midst of a hunger strike and the intubation was necessary to ensure he received sufficient nutrition to

avoid serious internal injuries." *Id*. at ¶¶ 22-23.  Although it was noted Plaintiff requested a smaller tube be used on June 11, 2013, there are no notations of issues in Plaintiff's medical records regarding feedings via NG intubation except on June 15, 2013, where Plaintiff was swollen and had bloody strings in his mucus.  *Id*. at ¶ 17.  At that time, Plaintiff refused any further attempts of force feeding.  Plaintiff was not forced again until June 18, 2013.  *Id*. at ¶ 18.  Size "12 French" NG tubes were used when administering Plaintiff's force feedings from June 18, 2013, onward.  *Id*. at ¶ 19.

It is well-established that disagreement with a course of treatment, or even a claim that negligence or medical malpractice occurred, does not provide a basis for an Eighth Amendment violation.  *Estelle*, 429 U.S. at 105-06.  Thus, because decisions regarding techniques and treatments are matters best left to medical personnel, prison medical personnel are vested with broad discretion in making such decisions.  *See Bost v. Bockelmann*, No. 9:04-CV-0246 (GLS/DEP), 2007 WL 527320, at *10 (N.D.N.Y. Feb. 20, 2007); *see also Rucker v. Fletcher*, No. 18-CV-6575-FPG, 2022 WL 3358139, at *8 (W.D.N.Y. Aug. 15, 2022).  Plaintiff's disagreements with the medical decisions to use "16 French" and "14 French" NG tubes from June 10 through June 15, 2013, is merely that, a disagreement.  This does not warrant constitutional protection.  *See O'Diah v. Mawhir*, No. 08-CV-322 (TJM/CFH), 2012 WL 4482579, at *8 (N.D.N.Y. Sept. 5, 2012), *report-recommendation adopted*, 2012 WL 4471183 (N.D.N.Y. Sept. 26, 2012).

Moreover, to the extent Plaintiff has disclosed an expert on this issue, the Court finds the "Declaration of Jon Wesley Boyd in Support of Testifying as an expert Witness for the Plaintiff", even if properly considered, fails to raise a material issue of fact.  (*See* Dkt. No. 123-1.)  There, in sum and substance, Dr. Boyd indicates he will testify to the following: (1) force feeding is

unethical; and (2) the manner in which Plaintiff was force fed from June 10 to June 15, 2013, "was done with deliberate indifference to the plaintiff's pain and suffering, and rose to the level of malicious and sadistic treatment." *Id*. at 1-2. To that end, Dr. Boyd

> will also testify that the plaintiff should have had a much smaller nasogastric tube than the one that was utilized and that he should have had a topical anesthetic such as lidocaine applied prior to the nasogastric tube placement in order to numb his pain receptors in his nose. Any medical care professional reasonably concerned with their patients' wellbeing with prior knowledge that they were going to participate in the force feeding a conscious patient should have had plenty of time to assess the size of nasogastric tube necessary for a particular patient in order to minimize pain and suffering on the part of their patient. Failing to do so constitutes negligence on the part of the person(s) responsible and was neither considerate nor respectful of the patient's needs. Furthermore, given the patient's weight at the time, there is no evidence of medical necessity to force feed the patient on June 10, 2013.

*Id*.

First, whether "force feeding is unethical" is not relevant to this action, nor is whether it was medically necessary to force feed Plaintiff on June 10, 2013. As the Court previously determined, Plaintiff's claims premised on the state court force feed order run afoul of the *Rooker-Feldman* doctrine, and all of Plaintiff's claims arising from his challenge to the state court force feed order were dismissed due to lack of subject matter jurisdiction. (Dkt. No. 9 at 14-15; Dkt. No. 39 at 12-13 & n.3.[12])

Second, the Court finds Dr. Boyd's "proposed testimony" regarding the size of the NG tube and use of a topical anesthetic also amounts to, at most, a difference of opinion. (*See, e.g.*, Dkt. 202-4 at 90 ("[N]asal gastric tubes are placed with lubricant and with icing of the tube to

---

[12] In any event, "[p]rison administrators have a right and a duty to step in and force an inmate to take nourishment if a hunger strike has progressed to the point where continuation risks serious injury or death." *Sawyer v. Prack*, No. 9:14-CV-1198 (DNH/DEP), 2014 WL 12923403, at *7 (N.D.N.Y. Dec. 31, 2014).

produce comfort.  They require that the patient have an active swallow and gag reflux.
Anesthetics are not a typical application, even for pediatric use.").)  However, as set forth above,
disagreements over medication, diagnostics, forms of treatment, and the need for specialists are
not adequate grounds for a § 1983 claim, since those issues implicate medical judgment and at
worst negligence constituting malpractice.  *See Sonds v. St. Barnabas Hosp. Corr. Health Servs.,*
151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001).

Stated another way, "[m]edical malpractice does not become a constitutional violation
merely because the victim is a prisoner."  *Estelle*, 429 U.S. 97, 106 (1976); *accord Hill*, 657 F.3d
at 123; *see also Smith*, 316 F.3d at 184 ("Because the Eighth Amendment is not a vehicle for
bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison
medical care will rise to the level of a constitutional violation."); *see also Douglas v. Stanwick*,
93 F. Supp. 2d 320, 325 (W.D.N.Y. 2000) ("Not every physician will treat every ailment in
exactly the same manner.  That does not mean that one of the physicians must be acting with
deliberate indifference . . . ."); *see also O'Diah v. Mawhir*, No. 08-CV-322 (TJM/CFH), 2012
WL 4482579, at *8 (N.D.N.Y. Sept. 5, 2012) ("Merely because two physicians decided upon
different treatment methods, this remains at worst a difference of opinion and not evidence of
deliberate indifference."), *report-recommendation adopted*, 2012 WL 4471183 (N.D.N.Y. Sept.
26, 2012).  "Physicians can and do differ as to their determination of the appropriate treatment
for a particular patient; that difference in opinion does not satisfy the requirements for a
constitutional claim of deliberate indifference."  *Adams v. Smith*, No. 9:15-CV-913 (BKS/DJS),
2018 WL 1363495, at *4 (N.D.N.Y. Mar. 16, 2018) (citations omitted).

Even if the decisions at issue caused Plaintiff unintended harm, tortious conduct is not
actionable under Section 1983.  *See Burroughs v. Petrone*, 138 F. Supp. 3d 182, 211 (N.D.N.Y.

2015) ("Deliberate indifference requires more than negligence but less than conduct undertaken for the very purpose of causing harm."); *Kucharczyk v. Westchester Cty.*, 95 F. Supp. 3d 529, 537 (S.D.N.Y. 2015) ("[M]ere negligence is not enough to state a claim for deliberate indifference."); *Smith*, 316 F.3d at 184 (2d Cir. 2003) ("Because the Eighth Amendment is not a vehicle for bringing medical malpractice claims, nor a substitute for state tort law, not every lapse in prison medical care will rise to the level of a constitutional violation."); *see also Sawyer v. Prack*, 2014 WL 12923403, at *7 ("[I]f weight loss and *temporary discomfort* are the only consequences of refusing to eat, then the inmate's choice to go on a hunger strike raises no Eighth Amendment concern.") (emphasis added) (citations omitted); *Lewis*, 920 F. Supp. 2d at 3589 (plaintiff's "voluntary" engagement in a hunger strike "undercuts his claims of deliberate indifference").

In light of the foregoing, and regardless of the statute of limitations issue, the Court finds Plaintiff has failed to adduce sufficient evidence from which a reasonable factfinder could conclude that Martuscello, Smith, Miller, Baldwin, and Rizzi acted with deliberate indifference to Plaintiff's medical needs by utilizing a "16 French" or "14 French" NG tube without a topical anesthetic from June 10 through June 15, 2013, during the course of his self-imposed hunger strike. Although Plaintiff obviously disagrees with the medical staff's assessment of the treatment he needed and/or received in June of 2013, such a disagreement is insufficient to establish deliberate indifference. *See Shomo v. N.Y.S. Dep't of Corr. Servs.*, No. 9:04-CV-0910, 2007 WL 2580509, at *12 (N.D.N.Y. Sept. 4, 2007) (holding that a prisoner's disagreement with a DOCCS employee regarding the treatment that he should properly receive is insufficient to state a claim under the Eighth Amendment" (footnote omitted)).

Accordingly, the Court recommends Defendants' motion for summary judgment be granted with respect to Plaintiff's Eighth Amendment deliberate indifference claims against Martuscello, Smith, Miller, Baldwin, and Rizzi.

**E. Retaliation**

**1. Legal Standard**

"To prevail on a First Amendment retaliation claim, an inmate must establish (1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected conduct and the adverse action." *Hayes v. Dahlke*, 976 F.3d 259, 272 (2d Cir. 2020) (cleaned up). As the Second Circuit has repeatedly cautioned, however, courts must approach claims of retaliation "'with skepticism and particular care' because 'virtually any adverse action taken against a prisoner by a prison official—even those otherwise not rising to the level of a constitutional violation—can be characterized as a constitutionally proscribed retaliatory act.'" *Davis v. Goord*, 320 F.3d 346, 352 (2d Cir. 2003) (quoting *Dawes v. Walker*, 239 F.3d 489, 491 (2d Cir. 2001)).

If the plaintiff carries this burden, then to avoid liability the defendants must show by a preponderance of the evidence that they would have taken action against the plaintiff even in the absence of the protected conduct. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977). If taken for both proper and improper reasons, state action may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson*, 89 F.3d 75, 79 (2d Cir. 1996) (citations omitted); *see also Brooks v. Rock*, No. 9:11-CV-1171 (GLS/ATB), 2014 WL 1292232, at *18 (N.D.N.Y. Mar. 28, 2014).

Analysis of retaliation claims thus requires careful consideration of the protected activity in which the inmate plaintiff has engaged, the adverse action taken against him or her, and the evidence tending to link the two. When such claims, which are exceedingly case specific, are alleged in only a conclusory fashion, and are not supported by evidence establishing the requisite nexus between any protected activity and the adverse action complained of, a defendant is entitled to the entry of summary judgment dismissing the plaintiff's retaliation claims. *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir. 1983), *overruled on other grounds by Swierkiewicz v. Sorema N.A.*, 534 U.S. 506 (2002).

**2. Analysis**

As set forth above, the Court liberally construed the TAC as asserting First Amendment retaliation claims against all Defendants except Huff. (Dkt. No. 91; Dkt. No. 159.) Defendants argue they are entitled to summary judgment because (1) Plaintiff's hunger strike is not a constitutionally protected activity and (2) Defendants' alleged conduct does not constitute adverse action. (Dkt. No. 197-6 at 21-32.) Defendants subject to retaliation claims for alleged actions arising out of Plaintiff's hunger strike also submit they are entitled to qualified immunity. *Id*. at 41.

As discussed above, Plaintiff has abandoned his retaliation claims against Annucci, Baldwin, Kenneweg, Miller, Rizzi, and Smith and "the only claims he now asserts are" (1) "retaliating for grievances against defendants Wagner, Almasi, Slaven, and Arvidson arising out of separate instances" and (2) "retaliating for filing remote control grievance against defendants Jackson, Davies, Martuscello, and Barringer arising out of two connected instances" in violation of the First Amendment. (Dkt. No. 202-1 at 7-8.)

It is well recognized that the filing of grievances and lawsuits is protected conduct, and can therefore satisfy the first prong of a retaliation claim. *Graham*, 89 F.3d at 80. Plaintiff has therefore sufficiently alleged that he engaged in constitutionally protected conduct with respect to his retaliation claims predicated upon his grievances and complaints. It is questionable whether Plaintiff could sustain an argument that his hunger strike in the prison setting reflected constitutionally protected speech.[13] *See Brown v. Graham*, No. 9:07-CV-1353 (FJS/ATB), 2010 WL 6428251, at *16 (N.D.N.Y. Mar. 30, 2010), *report and recommendation adopted*, 2011 WL 1213482 (N.D.N.Y. Mar. 31, 2011), *aff'd*, 470 F. App'x 11 (2d Cir. 2012). However, the Court need not decide this issue because Plaintiff's remaining retaliatory claims are all predicated on grievances and complaints.

Turning to the second element, Defendants contend the alleged retaliatory actions are objectively *de minimis* and do not fall under the purview of constitutional protection. (Dkt. No. 197-6 at 24-32; Dkt. No. 205 at 8-9.) The Court agrees with Defendants. "[I]n the prison context . . . adverse action" is "defined . . . *objectively*[ ] as retaliatory conduct that would deter a similarly situated individual of ordinary firmness from exercising . . . constitutional rights." *Gill v. Pidlypchak*, 389 F.3d 379, 381 (2d Cir. 2004) (internal quotation marks and citation omitted). "[T]his objective test applies even where a particular plaintiff was not himself subjectively deterred; that is, where he continued to file grievances and lawsuits." *Id*. Courts "look to the specific circumstances in which retaliation claims arise, 'bearing in mind that prisoners may be required to tolerate more than average citizens, before a retaliatory action taken against them is

[13] (*See* Dkt. No. 9 at 26 (assuming without deciding, that a hunger strike is a protected activity in the context of a retaliation claim) (citing *Green v. Phillips*, No. 04-CV-10202, 2006 WL 846272, at *3 (S.D.N.Y. Mar. 31, 2006) (assuming without deciding that retaliation against an inmate for participation in a hunger strike is a constitutional violation); *see also* Dkt. No. 34 at 5-6, 13-16; Dkt. No. 91 at 16.)

considered adverse.'" *Hayes*, 976 F.3d at 272 (quoting *Davis v. Goord*, 320 F.3d at 353) (internal quotation marks and alterations omitted). The Court addresses the alleged retaliatory conduct in turn.

**a. Almasi**

The record demonstrates Almasi was a librarian in the general library at Coxsackie C.F. when Plaintiff was in the infirmary. (Dkt. No. 197-5 at ¶ 100.) Plaintiff would make written requests to Almasi for books while he was in the infirmary, but he was only allowed one general library book and one interlibrary loan book at a time. *Id*. at ¶¶ 102, 103.[14] Plaintiff filed a grievance against Almasi for only receiving one book at time, and then, allegedly, Almasi stopped bringing the books Plaintiff requested altogether. *Id*. at ¶ 104. Plaintiff received a response to his grievance, which stated that books in the infirmary dayroom were available to Plaintiff. *Id*. at ¶ 105. During his deposition, Plaintiff testified Almasi would generally rotate the books available in the dayroom. (Dkt. No. 197-5 at ¶ 106; Dkt. No. 202 at ¶ 106.)

"Mindful that inmates 'may be required to tolerate more than average citizens[ ] before a retaliatory action taken against them is considered adverse'" *Davis*, 320 F.3d at 353, the Court concludes Almasi's alleged action of ignoring Plaintiff's requests for general library books would not "deter a similarly situated individual" from exercising his constitutional rights. (Dkt. No. 197-6 at 24-25.) As a result, the Court recommends Defendants' motion for summary judgment be granted with respect to Plaintiff's First Amendment retaliation claims against Almasi.

---

[14] Materials requested from the general library were for reading pleasure only and were not associated with any legal research or other purpose. (Dkt. No. 197-5 at ¶ 107.)

**b. Arvidson**

Arvidson, a Corrections Officer, was present during some of Plaintiff's force feedings. (Dkt. No. 1975-at ¶¶ 108, 109.) In his declaration, Plaintiff clarifies that his retaliation claim against Arvidson stems from an incident on March 12, 2015. (Dkt. No. 202-2 at ¶¶ 253-261.) To that end, Plaintiff asked Arvidson not to put his foot on the wall and said he would report Arvidson to his supervisor. (Dkt. No. 197-5 at ¶ 109.) Plaintiff alleges Arvidson "then stood over me as I was on the bed with his fists clenched and challenged me to stand up to fight." (Dkt. No. 202-2 at ¶¶ 254, 255.) "He refused to leave after I asked him. Using his authority and threat of violence to hold me captive in my own bed for over 5 minutes. Preventing me from using my own toilet." *Id*. at ¶ 256.

In this Circuit, allegations of verbal harassment or threats are generally an insufficient basis for an inmate's Section 1983 claim. *See Purcell v. Coughlin*, 790 F.2d 263, 265 (2d Cir. 1986) ("The claim that a prison guard called Purcell names also did not allege any appreciable injury and was properly dismissed"); *Hayes v. Dahkle*, No. 9:16-CV-1368 (TJM/CFH), 2017 WL 9511178, at *7 (N.D.N.Y. Oct. 30, 2017) ("[v]erbal harassment absent injury, is generally insufficient to rise to the level of a constitutional violation"); *Ross v. Westchester Cty. Jail*, No. 10 Civ. 3937, 2012 WL 86467, at *7 (S.D.N.Y. Jan. 11, 2012) ("Non-specific verbal threats, harassing comments and hostile behavior do not constitute adverse actions sufficient to state a retaliation claim."); *see also Yunus v. Jones*, No. 9:16-CV-1282 (GTS/ATB), 2017 WL 9511176, at *9 (N.D.N.Y. Aug. 23, 2017) (threatening behavior, where the defendant "moved in a very aggressive manner in what seemed like an attempt to physically attack plaintiff", without injury, does not give rise to federal claim), *report-recommendation adopted*, 2017 WL 5956762 (N.D.N.Y. Dec. 1, 2017). Additionally, "[b]rief deprivations of toilet paper or access to a

bathroom are not adverse actions in a § 1983 retaliation claim." *Burgess v. Banasike*, No. 6:19-CV-06617 EAW, --- F. Supp. 3d ----, 2022 WL 13740744, at *9 (W.D.N.Y. Oct. 24, 2022); *see, e.g.*, *Mateo v. Alexander*, No. 10 CIV. 8427, 2012 WL 864805, at *5 (S.D.N.Y. Mar. 14, 2012) (denial of access to a bathroom for an hour on two separate occasions did not rise to the level of adverse action for purposes of retaliation claim).

Thus, the Court finds Arvidson's alleged retaliatory actions did not constitute adverse action and would not "deter a similarly situated individual" from exercising his constitutional rights. (Dkt. No. 197-6 at 24-25.) As a result, the Court recommends Defendants' motion for summary judgment be granted with respect to Plaintiff's First Amendment retaliation claims against Arvidson.

**c. Slaven**

Plaintiff claims Sergeant Slaven retaliated against him for complaining about the conditions in the infirmary. (Dkt. No. 197-5 at ¶¶ 158, 159.) Specifically, Slaven decreased his morning recreation time and harassed another incarcerated individual, Salvatore DeJesus, to create animosity between DeJesus and Plaintiff. *Id*. at ¶ 160. To that end, Plaintiff claims Slaven attempted to cause a fight between Plaintiff and DeJesus by searching DeJesus' cell and blaming Plaintiff for the search. (Dkt. No. 197-5 at ¶ 161; TAC at 161-62.) Plaintiff further claims Slaven told DeJesus that Plaintiff said DeJesus was a sex offender. (Dkt. No. 197-5 at ¶ 162; TAC at 162-63.) As a result, Plaintiff feared for his safety. (Dkt. No. 202-1 at 42-43.) There is no evidence, however, that Slaven's statements caused DeJesus to take any action against Plaintiff.

Again, "[m]indful that inmates 'may be required to tolerate more than average citizens[ ] before a retaliatory action taken against them is considered adverse'" *Davis*, 320 F.3d at 353, the

Court concludes Slaven's alleged action of decreasing recreation time by two hours would not "deter a similarly situated individual" from exercising his constitutional rights.[15] (Dkt. No. 197-6 at 29-30.) The Court also finds Slaven's alleged statements do not rise to the level of adverse action required to maintain a First Amendment retaliation claim. *See, e.g.*, *Zielinski v. Annucci*, 547 F. Supp. 3d 227, 233 (N.D.N.Y. 2021) (finding neither the verbal threats of future physical harm uttered by defendant, nor defendant's act of calling the inmate-plaintiff a "rat" in front of other inmates satisfy the "adverse action" requirement necessary to sustain a First Amendment claim for retaliation); *Williams v. Muller*, No. 98 Civ. 5204, 2001 WL 936297, at *4 (S.D.N.Y. Aug. 17, 2001) (holding that prison official's alleged spreading of rumors intended to incite inmates to harm plaintiff was insufficient to support a retaliation claim in the absence of physical harm to plaintiff); *Snyder v. McGinnis*, No. 03-CV-0902, 2004 WL 1949472, at *11 (W.D.N.Y. Sept. 2, 2004) (finding the inmate's retaliation claim against prison official who publicly referred to plaintiff as a "snitch" and a child molester must fail because plaintiff failed to allege that he was subsequently physically harmed by his fellow inmates); *Yunus*, 2017 WL 9511176, at *9 ("It is well settled that retaliatory cell searches are not actionable under § 1983.").

Therefore, the Court recommends granting Defendants' motion for summary judgment with respect to Plaintiff's retaliation claims against Slaven.

---

[15] Plaintiff does not allege he was otherwise denied the opportunity to access the infirmary day room. Plaintiff admits the day room was open from 1:00 p.m. to 3:00 p.m. and 6:00 p.m. to 9:30 p.m., Plaintiff was afforded three and a half hours of recreation time per day, in addition to one hour of recreation per day in the infirmary recreation yard. (Dkt. No. 197-5 at ¶¶ 73, 74, 75; Dkt. No. 202 at ¶ 75 ("Slaven ended 9-11 am recreation ("rec") after I filed grievances."). Insofar as Plaintiff suggests Slaven violated the "Infirmary Guidelines" by directing the day-shift officers to "deny" Plaintiff morning recreation indefinitely, Slaven's alleged failure to follow a DOCCS directive does not amount to a constitutional violation. *See Burroughs*, 138 F. Supp. 3d at 219; *Sanders v. Gifford*, No. 11-CV-0326, 2014 WL 5662775, at *4 (N.D.N.Y. Nov. 4, 2014).

**d. Wagner**

Plaintiff claims Corrections Officer Wagner retaliated against him by closing the dayroom early on certain occasions; hiding the remote control for the dayroom television; not allowing Plaintiff out of his cell to watch both weekend movies on certain occasions; withholding non-legal mail on one occasion; and kicking the dayroom door loudly. (Dkt. No. 197-5 at ¶¶ 169, 170; Dkt. No. 202-2 at ¶ 287.)

The Court finds Wagner's alleged retaliatory actions are insufficient to constitute adverse action. (Dkt. No. 197-6 at 30-32.) First, "[c]ase law suggests that the isolated or sporadic denial of privileges do not suffice to state a claim of actionable retaliation." *Lunney v. Brureton*, No. 04 Civ. 2438, 2007 WL 1544629, at *20 (S.D.N.Y. May 29, 2007) (citing *inter alia Davidson v. Chestnut*, 193 F.3d 144, 150 (2d Cir. 1999)). Plaintiff has not alleged he was denied all recreation—he admits that he was let out of his cell to watch the "early" movie but not the "late" movie, eventually was allowed to watch both the early and late movie on weekends, and the dayroom television could be used without the remote control. (Dkt. No. 197-5 at ¶¶ 177, 178; *see also* Dkt. No. 202-2 at ¶¶ 270, 335, 338.) Thus, such retaliatory actions are *de minimis*. Second, "[c]ourts in this circuit have held that claims of mail tampering do not constitute adverse action." *Tafari v. McCarthy*, 714 F. Supp. 2d 317, 347 (N.D.N.Y. 2010) (collecting cases in which claims of mail tampering did not constitute an adverse action, noting in particular that the plaintiff had alleged only a single instance of mail interference); *see also Rasheen v. Adner*, 356 F. Supp. 3d 222, 243-44 (N.D.N.Y. 2019) (finding an isolated incident of mail tampering did not constitute an adverse action because plaintiff failed to allege facts plausibly suggesting that he suffered any injury as a result). Third, the alleged act of kicking the dayroom door to announce the end of recreation time, which "caused a loud startling boom" (Dkt. No. 197-5 at ¶ 187; Dkt.

No. 202-2 at ¶ 287), does not rise to the level of adverse action such that it would deter a similarly situated individual from exercising his constitutional rights.

Thus, the Court recommends granting Defendants' motion for summary judgment with respect to Plaintiff's retaliation claims against Wagner.

**e. Jackson, Davies, Barringer, and Martuscello**

Plaintiff alleges Corrections Officers Jackson and Davies retaliated against him by taking and/or destroying the television remote control from the infirmary dayroom on November 20, 2016. (Dkt. No. 202-2 at ¶ 311.) Plaintiff does "not claim to know which of the two actually took the remote. But I do allege that they were in it together. And therefore equally culpable." *Id*. at ¶ 312. Plaintiff claims Martuscello, the Superintendent, and Barringer, the Deputy Superintendent of Programs, retaliated against him by not timely replacing the television remote control in the infirmary dayroom and failing to effectively address Plaintiff's complaints, both written and verbal, regarding his alleged deprivations in the infirmary. (Dkt. No. 202-2 at ¶¶ 334-45.)

The Court agrees with Defendants that precluding Plaintiff from accessing a television remote control does not constitute adverse action involving constitutional protections, as such conduct would not deter a similarly situated individual from exercising his constitutional rights. (Dkt. No. 197-6 at 27.) *See also Burroughs v. Petrone*, 138 F. Supp. 3d at 207 ("the destruction of video/audio tapes that purportedly support plaintiff's claims of alleged violations of plaintiff's civil rights does not constitute sufficiently adverse action to be cognizable as a retaliation claim"). Likewise, the Court finds the alleged failure to timely replace a television remote control and/or the failure to adequately address a grievance or complaint does not constitute adverse action. *See, e.g.*, *Islam v. Goord*, No. 05 Civ. 7502, 2006 WL 2819651, at *5 (S.D.N.Y.

Sept. 26, 2006) (finding the allegation that the defendant conducted an inadequate investigation of the plaintiff's complaint failed to meet the "adverse action" requirement). Further, as Defendants point out, Plaintiff was not precluded from watching television when the remote "went missing" because the television could be controlled manually using the controls on the televisions. (Dkt. No. 197-6 at 27.) And, as Plaintiff acknowledges, the dayroom television was ultimately replaced. (Dkt. No. 202-2 at ¶ 344.)

Consequently, the Court recommends granting Defendants' motion for summary judgment with respect to Plaintiff's retaliation claims against Jackson, Davies, Barringer, and Martuscello.

## V.    CONCLUSION

After carefully reviewing the record, the parties' submissions, and the applicable law, and for the reasons stated herein, it is hereby

**RECOMMENDED** that the Clerk be directed to revise the docket to terminate defendant New York State; and it is further

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 197) be **GRANTED**; and it is further

**RECOMMENDED** that Plaintiff's third amended complaint (Dkt. No. 159) be **DISMISSED IN ITS ENTIRETY**, and it is further

**ORDERED** that the Clerk provide to Plaintiff a copy of this Order and Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with the Second Circuit decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009) (*per curiam*).

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report.[16] Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72.

**SO ORDERED.**

Dated: February 28, 2023
Syracuse, New York

Therèse Wiley Dancks
United States Magistrate Judge

[16] If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections. Fed. R. Civ. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Fed. R. Civ. P. 6(a)(1)(C).